**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER GATLIN,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW WELLE, MATTHEW SHUTE, CODY GOODWIN, ST. LOUIS COUNTY, THE CITY OF SAINT LOUIS, AND AMAZON WEB SERVICES, INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:25-cv-00043-ACL<br><br>JURY TRIAL REQUESTED |

**[PROPOSED] THIRD AMENDED COMPLAINT**

Deleted: SECOND

Christopher Gatlin is a 30-year-old St. Louis resident. Officers of the St. Louis County and St. Louis City Police Departments violated every police practice in the book, causing Mr. Gatlin to be locked up in the hellish St. Louis County Jail for nearly two years. In the spring of 2024, charges against him were finally dropped given the utter lack of evidence against him. He brings this action to vindicate his rights under the United States Constitution and the state laws of Missouri.

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Christopher Gatlin is a St. Louis resident. He is also African-American.

2. Defendants Cody Goodwin and Matthew Shute are officers of the St. Louis County Police Department.

3. Defendant Matthew Welle is an officer of the St. Louis City Police Department.

4. Goodwin, Shute, and Welle are all white.

5. At all times, Goodwin, Shute, and Welle were acting under color of law.

6. Defendant St. Louis County is a political and geographical subdivision of the State of Missouri existing pursuant to Missouri law.

Deleted: Illinois

7. Defendant St. Louis City is a political and geographical subdivision of the State of Missouri existing pursuant to Missouri law.

8. Defendant Amazon Web Services, Inc., or "AWS" or "Amazon", is a Delaware corporation with its principal place of business in Seattle, Washington.

9. AWS developed and placed into the stream of commerce "Rekognition," a program that provides facial recognition services to customers. AWS operates its facial recognition platform in every state in the U.S.A, including Missouri, and across the world.

Deleted: Reokognition

10. Defendant is subject to personal jurisdiction in this state because it conducted substantial business activities in Missouri, has cultivated a market for its services in Missouri, and this cause of action arises out of these business activities, such that the exercise of personal jurisdiction does not offend due process.

11. This case is brought pursuant to 42 U.S.C. § 1985, 42 U.S.C. § 1983 and state law.

12. This Court has federal question jurisdiction.

13. Venue is appropriate in this Court pursuant to 28 U.S.C. 1391 (b) since all incidents giving rise to this suit occurred in this judicial district.

## ALLEGATIONS

*The Assault at the MetroLink Station*

14. In December of 2020, Christopher Gatlin was living in the St. Louis area.

15. On December 7, 2020, two men assaulted a MetroLink security guard ("M.F.") at the St. Charles Rock Road station at 7001 St. Charles Rock Road in North St. Louis County. Mr. Gatlin had nothing to do with this assault.

16. One of the men ("Suspect 1") was a taller man of fair complexion. The other man ("Suspect 2") was shorter and appeared to be a Black man with a dark skin tone.

17. At the time, Defendants Shute and Welle worked on a joint team of St. Louis County and City detectives who investigated crimes on the MetroLink.

18. On the day of the assault, St. Louis County Police Officer Puscul went to the hospital to visit M.F., who told the officer that he "could not remember" what happened after the two male suspects began to assault him. This was not unexpected, as M.F. suffered a traumatic brain injury as a result of the attack.

19. M.F. suffered a traumatic brain injury, Post-Concussion Syndrome, and struggles with sleep, walking, and cognition. Years after, he still experiences trouble problem solving, and continues to experience ringing in his ear and throbbing in his head. He has difficulties with speech. He receives assistance with his medical needs from somebody who lives with him.

20. The following day, December 8, 2020, Detective Piscul again went to visit M.F., who told Det. Piscul that he could not remember any information about the two suspects who attacked him.

21. In the days following the assault, Defendants Shute and Welle retrieved footage from the MetroLink train station and from a bus that the two suspects walked past after assaulting M.F.

22. On December 16, Defendant Shute contacted M.F. This was the third interview of M.F. by an investigating officer. Once again, M.F. told Shute according to the police report, "I honestly do not know if I can identify them due to me being knocked out."

23. On December 28, 2020, Shute again contacted M.F., who again reiterated that he was unable to provide assistance about his assault because he had been knocked out. That was the fourth time that Shute told investigating officers that he did not know the identity of his assailants.

24. Moreover, in December, Shute and Welle contacted five local shelters for the unhoused. All five shelters stated that Suspect 2 looked familiar to them. This was clear evidence that Suspect 2 was likely unhoused and not Mr. Gatlin.

25. However, Shute and Welle were unable to locate further leads on Suspect 1 and Suspect 2. As a result, Shute wrote in his report in late December, "this case should be considered inactive unless further leads develop."

*Shute and Welle's Flagrantly Incorrect Use of Facial Recognition Technology*

26. More than eight months later, on August 9, 2021, Defendants Shute and Welle attempted to revive the case by uploading still photos from the bus surveillance video into the St. Louis Mugshot Recognition Technology System ("SMRT System").

27. The SMRT System relies upon facial recognition technology ("FRT"), a developing field which attempts to match similarities from an image of one face (a "probe image") in order to find a possible match to a face in another photo, such as a mug shot.

28. Once a probe image is fed into the system, the system generates a "faceprint" through measurements or calculations on the image of the face, compares the faceprint it

generates from the probe image to a database of already-generated faceprints of other images, and produces an output.

29. The form of the output varies from system to system. Because facial recognition systems are inherently probabilistic (meaning they cannot say with certainty that two different images are or are not a match), they typically display a list of possible matches (a "candidate list"). Facial recognition systems are not designed to produce, and are not capable of producing, a definitive match or positive identification. The technology is not designed to assert that the first-returned result, or any of the returned results, is an actual match.

30. FRT is a nascent field that even practitioners admit is unreliable. It is notoriously bad at identifying certain groups, specifically Black men. *See* Drew Harwell, "Federal Study Confirms Racial Bias of Many Facial Recognition Systems, Casts Doubt on Their Expanding Use," WASH. POST (Dec. 19, 2019).[1]

31. African-Americans are up to 100 times more likely to be misidentified by facial recognition software than white men. *Id.*

32. A Facial Examiner Workstation, including the SMRT System, was sold to the St. Louis Metropolitan Police Department ("SLMPD") in 2017 and is connected to the City's "Real Time Crime Center."

33. Upon information and belief, at the time of these incidents, any local police officer was provided unfettered access to the SMRT System.

34. Moreover, the vast majority of images that make up the SMRT System database are taken from local municipal jurisdictions, many of whom have for years targeted poor and

[1] https://www.washingtonpost.com/technology/2019/12/19/federal-study-confirms-racial-bias-many-facial-recognition-systems-casts-doubt-their-expanding-use/

**Formatted:** Default Paragraph Font, Font: Calibri, 10 pt

Black drivers. *See* United States Department of Justice Civil Rights Division, "Investigation of the Ferguson Police Department," March 4, 2015. These images largely consist of persons ticketed for traffic violations. As a result, the SMRT System database is disproportionately filled with African-American individuals, the vast majority of whom, like Mr. Gatlin, have not been found guilty of a felony or misdemeanor.

35. Despite widespread scientific research showing that darker and Black faces are overly represented in false matches in facial recognition technology, the SLMPD and St. Louis County Police Department ("SLCPD") continued to use the SMRT System without training its officers on any safeguards that might have prevented false identification of Black suspects like Mr. Gatlin.

**Deleted:** system

36. Upon information and belief, neither Welle nor Shute had *any* training on how to use the FRT program, or the potential pitfalls of the technology, before they used the program.

37. On or around August 9, 2021, Defendant Welle uploaded a grainy surveillance photo of Suspect 2. The image was blurry and it was taken both at a distance and from an angle above Suspect 2's face. In addition, Suspect 2's face was obscured by both a hooded sweatshirt covering his forehead and a COVID mask covering his chin.



**Deleted:** 

38. Because facial recognition technology operates by attempting to match details in a probe image to details in database images, it is well established that facial recognition searches are less accurate if the probe image is of low quality. Several qualities of a probe image are particularly important for an accurate facial recognition search: (1) the image resolution, (2) facial obstruction, (3) facial expression, (4) the lighting, and (5) the angle at which the face is captured in the image. Any one of these factors can dramatically reduce the reliability of facial recognition search results; multiple factors combined have an even more pronounced effect in degrading reliability of the technology.

39. Published SMRT System guidance warns officers that "Image quality is the **most significant** factor in the overall performance of the SMRT system." (Emphasis added).

40. Published SMRT System guidance also warns officers that "Surveillance, ATM, bank, retail, and other images commonly fall outside the expected parameters for good image quality."

41. According to SMRT System policies, the "probe image" used from the bus surveillance photo had several indicators of unreliability. The SMRT System says that the key factors critical to a quality probe image are 1) image resolution, 2) no obstructions of the face, 3) both eyes open, and 4) all features of the face being plainly apparent.

42. The probe image of Suspect 2 was unreliable because 1) the resolution was poor, 2) Suspect 2's face was obstructed 3) Suspect 2's eyes were not visibly open, 4) and Suspect 2's chin, ears, and forehead were all obscured. The probe image was also unreliable because the face was depicted at an angle and from a distance.

43. The SMRT User Manual further specifically warned officers that security cameras, like the camera that captured the image of Suspect 2, are unreliable: "Most security

cameras provide low-quality probe images due to the fact [that] these cameras are seldom located in an area that captures a person's face directly. They instead typically capture a person's face from a very obscuring angle. Also, security cameras typically store very low-quality images to conserve storage space."

44. Despite these glaring warnings that the SMRT System had not been used correctly and the results of the facial recognition search would be of low reliability, Shute wrote in the police report that the SMRT system "returned results physically matching" Mr. Gatlin. No other investigative leads pointed to Mr. Gatlin, and until the SMRT report, Mr. Gatlin was not a suspect.

45. Besides the misuse of FRT, Welle's certainty that Mr. Gatlin and Suspect 2 were the same is likely a product of the well-documented bias that white individuals have when misidentifying Black individuals.[2]

46. Mr. Gatlin did not assault M.F., and any comparison of the two photos shows that the only characteristic shared by the men is that they are Black men with dark skin tones.

47. Despite the glaring signs of shoddy police work, Defendants Shute and Welle decided that Mr. Gatlin was Suspect 2, even in the absence of any evidence to support this claim.

48. Defendants Welle and Shute failed to avail themselves of other safeguards that would have prevented the false identification of Mr. Gatlin. These safeguards include the following:

[2] The Innocence Project, "What Wrongful Convictions Teach Us About Racial Inequality," available at: http://www.innocenceproject.org/Content/What_Wrongful_Convictions_Teach_Us_About_Racial_Inequality.php.

a. The SMRT System allows investigators to create and print "Candidate Reports" that directly compares the faces for the investigator. Based upon the full production of the SMRT records from this case, Welle failed to use the Candidate Report.

b. The SMRT System also allows investigators to generate a "Match Report" that requires an officer to specify up to four specific areas of similar features. Based upon the full production of the SMRT records from this case, Defendant Welle failed to use the Match Report.

c. The SMRT System allows for an expert analyst to help to provide an examination of an investigator's work, in order to prevent false identifications. Based upon the full production of the SMRT records from this case, Defendant Welle failed to avail himself of expert analysis.

49. Based upon the photo of Mr. Gatlin that Defendants Welle and Shute located from an improper use of the SMRT system and their own misidentification of Mr. Gatlin, Det. Shute created a photo lineup of six individuals.

50. In rushing to their conclusion that Mr. Gatlin had committed this assault, Defendants Shute and Welle failed to follow the warnings of the SMRT policies that SMRT is not a method of positively identifying an individual.

51. SMRT guidance and national procedures make clear that identification from facial recognition technology should be followed up by actual police investigatory work, such as determining if a suspect has any alibis, or if the suspect had committed similar crimes previously.

52. Moving straight from a facial recognition search to a photo lineup taints the reliability of the lineup. Facial recognition searches often generate false matches, and because facial recognition algorithms are designed to identify faces that look similar to the probe image, those false matches are highly likely to look similar to the suspect even though they are *not* the

suspect. Building a photographic lineup around a false-match facial recognition result, plus five filler photos, means the witness is likely to mistakenly believe the facial recognition lookalike is a match. As the Detroit Chief of Police put it after his department made its *third* wrongful arrest due to police reliance on a false match from facial recognition plus a tainted photo lineup, by moving straight from facial recognition result to lineup "it is possible to taint the photo lineup by presenting a person who looks most like the suspect" but is not in fact the suspect.[3] Put another way, "[t]he witness's corroboration may be so closely tied to the computerized face-recognition match that it lacks independence."[4]

**Amazon Courts Law Enforcement with a Defective Product**

53. In 2017, Amazon launched its "Rekognition" facial recognition program.

54. Soon thereafter, Amazon began courting law enforcement and governments as Rekognition customers.

55. In 2018, Amazon took part in a "technology boot camp" with ICE and other law enforcement agencies that was sponsored by McKinsey & Company. After the meeting, Amazon followed up with ICE and offered to conduct free one-day trainings on Rekognition with ICE.

56. Amazon created a YouTube link to a Rekognition video that provided resources for law enforcement to use Rekognition in police work. This link has since been disabled by Amazon and is no longer publicly available.

---

[3] City of Detroit Government, *WATCH LIVE: Chief White Will Provide Updated Comments on a Lawsuit Filed Last Week*, Facebook (Aug. 9, 2023), https://www.facebook.com/CityofDetroit/videos/287218473992047.

[4] Henry H. Perritt Jr., *Defending Face-Recognition Technology (And Defending Against It)*, 25 J. Tech. L. & Pol'y 41, 59 (2021).

57. Amazon's efforts to bring in law enforcement customers came with the chance to upload millions of facial images into its algorithm.

58. In June 2018, Amazon extended a free $750 credit to St. Louis County for its use of Rekognition for its police department.

Deleted: .

59. Amazon knew that St. Louis County was going to use Rekognition for criminal investigations.

60. With use of Amazon's credit, St. Louis County uploaded more than 500,000 mug shots to create a database of potential images.

61. This database soon became the sole source of images for the SMRT system from mid-2018 until at least 2025.

62. The SMRT system did not use any other FRT software, program, or technology from mid-2018 until at least 2025.

63. The 500,000 mug shots uploaded from St. Louis County were held on servers owned and operated by AWS for use of its Rekognition programs.

64. AWS specifically designed its software so that Rekognition could be integrated into proprietary software programs like SMRT.

65. The SMRT program used Rekognition in the following way: a SMRT user would enter a probe image into SMRT, which would then upload the image onto AWS servers. Rekognition would create a proposed set of candidates, which it would then send back to be presented into the SMRT program.

66. The SMRT program then displayed the images suggested as candidates by Rekognition.

67. The SMRT program used by St. Louis County from mid-2018 onward was specifically connected to Amazon's Rekogniton software.

68. SMRT did not use any other FRT programs during this time.

69. As this was occurring in St. Louis, many privacy advocates were publicly criticizing Amazon and Rekognition. In July 2018, the American Civil Liberties Union ran images of members of the United States Congress through Rekognition and received 28 incorrect matches.

Deleted: <#>In Washington state, a different law enforcement entity that contracted with Amazon uploaded another 300,000 images to the Rekognition database.

70. The false matches were disproportionately the faces of people of color, including eleven people of color and six members of the Congressional Black Congress.

71. Earlier in 2018, the Congressional Black Caucus wrote a letter to Jeff Bezos, the CEO of Amazon, warning of the potential risks of facial recognition. The letter stated in part, "[w]e are worried deployment of technology like the one you have developed has a high propensity for misuse."

72. In Washington state, a different law enforcement entity that contracted with Amazon uploaded another 300,000 images to the Rekognition database.

73. In January 2019, Gizmodo, a prominent tech website, published an interview with a law enforcement agency which was currently using the Rekognition program for investigatory purposes.[5]

74. The article also described the agency using a "confidence threshold" below that suggested by Amazon. Amazon describes the term "confidence threshold" to be "the percentage likelihood that Rekognition found a match."

[5] https://gizmodo.com/defense-of-amazons-face-recognition-tool-undermined-by-1832238149

Formatted: Font: Times New Roman, 12 pt

Formatted: Font: Times New Roman, 12 pt

75. The article stated, "while Amazon did supply documentation and other support on the software end, no direct training was given to the investigators who continue to use the suite."

76. Another law enforcement officer was quoted in the same article was saying that Rekognition's documentation "is very lacking or wrong."

77. During this same period between 2018-2020, Black men around the country began to be wrongfully arrested based on bad facial recognition leads.

78. At least three similar wrongful arrests occurred prior to Mr. Gatlin's. Each was in the news: Nijeer Parks in New Jersey, Michael Oliver in Detroit, and Robert Williams in Detroit.

79. In each case, the officers failed to properly use facial recognition programs, leading to the wrongful arrest of these men.

80. Amazon was aware or should have been aware of the misuse of FRT by law enforcement.

**Deleted:** that these arguments were occurring nationwide.

81. Despite being aware of Rekognition's misuse and the misuse of FRT more generally, Amazon failed to take any steps to ensure law enforcement agencies were correctly using Rekognition.

82. Amazon also failed to mandate that law enforcement agencies to use a certain confidence threshold, to reduce bad identifications.

83. In 2019, the National Institute of Standards and Technology ("NIST") attempted to analyze the quality of facial recognition of dozens of different FRT programs. The purpose of this study was to "help software developers better understand the performance of their algorithms," citing "the need to understand the effect of demographics on face recognition algorithms."

84. The study found that there were higher rates of false positives for Black individuals' faces relative to the images of white people.

85. Because Amazon did not make its Rekognition algorithm public, the NIST study could not evaluate the quality of Rekogniton's FRT.

86. A different 2019 academic study found that the "accuracy gap" between correct identification of darker-skinned faces and lighter-skinned faces was 34.4 percent—meaning that darker-skinned faces were misidentified significantly more frequently than lighter-skinned faces.

87. Amazon failed to notify its customers, including St. Louis County, of the known problem with Rekognition's misidentification of the faces of people of color.

88. Amazon also failed to provide any guidelines or best practices for the law enforcement agencies, including St. Louis County, whom Amazon knew was using its product.

89. Amazon did not provide any requirements or training to St. Louis County or other customers on the use of its product to ensure that Rekognition was not abused.

90. Given the known misuse of facial recognition and the lack of training or guidelines for Rekognition, it was entirely foreseeable that law enforcement officers would continue to misuse Amazon's product as they did in Mr. Gatlin's case.

**Amazon's "Moratorium"**

91. In June 2020, Amazon implemented a one-year "moratorium" on law enforcement agencies' use of Rekognition.

92. In a press release announcing this moratorium, Amazon cited concerns about insufficient regulations around the ethical use of facial recognition technology.[6]

Deleted:

93. As the press release makes clear, Amazon knew that law enforcement agencies were not sufficiently regulating the use of Rekognition.

94. Upon information and belief, Amazon was aware of specific incidents of misidentification of suspects by law enforcement agencies using Rekognition.

95. By implementing its moratorium, Amazon admitted its product was being abused by law enforcement agencies.

96. Despite its press release, Amazon did not adequately notify any police departments of this moratorium.

Deleted: actually

97. While Amazon allowed the use of Rekognition by law enforcement for specific limited purposes, Amazon failed to adequately notify its customers that Rekognition could no longer be used in connection with criminal investigations.

98. Despite knowing of the dangers of law enforcement abuse of its product, Amazon did not take adequate steps to determine whether Rekognition continued to be used by law enforcement in violation of the moratorium.

99. Amazon had access to data that allowed it to see the frequency of use of Rekognition by its customers.

100. Amazon knew or should have known that St. Louis County continued to use Rekognition in connection with criminal investigations during the moratorium.

[6] https://www.aboutamazon.com/news/policy-news-views/we-are-implementing-a-one-year-moratorium-on-police-use-of-rekognition

Formatted: Font: Times New Roman, 12 pt

Formatted: Font: Times New Roman, 12 pt

101. Because Amazon failed to notify St. Louis County or its employees of the moratorium, the SMRT System continued to be used at the same frequency by St. Louis County and other users of SMRT.

102. While several high-level Amazon employees personally interacted with St. Louis County employees who designed SMRT, no Amazon employees personally notified St. Louis County of its moratorium.

103. As a result, St. Louis County continued to operate the SMRT System using Rekognition from 2020-2024 as though there were no issue at all.

**Deleted:** FRT program in 2020 and 2011

104. A year later, in May 2021, Amazon decided to indefinitely continue its moratorium for use of FRT in law enforcement.

105. To avoid media attention around the issue, Amazon issued a one-sentence statement that the moratorium would continue.

106. Once again, Amazon failed to notify its law enforcement customers about its ongoing moratorium.

107. Amazon also failed to take any steps to determine if law enforcement agencies were either a) continuing to use its product in violation of the moratorium or b) continuing to misuse Rekognition without providing proper training and guard rails.

108. Instead, Amazon inserted only a single sentence into its Terms of Service informing customers of the moratorium. That sentence read: "**50.9.1**. Amazon has implemented a moratorium on use of Amazon Rekognition's face comparison feature by police departments in connection with criminal investigations."

109. Amazon's Terms of Service consist of over 180 pages of text covering 110 separate topics.

110. Amazon's Terms of Service are set up so that users are bound by any updates to the terms of service. Accordingly, Amazon changed its Terms of Service with St. Louis County without a single St. Louis County employee ever learning of the moratorium implemented for law enforcement agencies.

111. Amazon never took any further steps to notify St. Louis County of the ongoing moratorium for the use of FRT.

112. Despite its purported "moratorium," Amazon continued issuing invoices to the St. Louis County Police Department, specifically for the use of Rekognition. Below is the invoice for August 2021, when Rekognition wrongly identified Christopher Gatlin for the assault of M.F.

aws

Account number:
[redacted]

Bill to Address:
St. Louis County Police Department
ATTN: Sgt. D[redacted]
7900 FORSYTH BLVD
SAINT LOUIS , MO , 63105-3809 , US

**Amazon Web Services, Inc. Invoice**

Email or talk to us about your AWS account or bill, visit aws.amazon.com/contact-us/

| Invoice Summary | |
|---|---|
| Invoice Number: | 839974953 |
| | Please include this invoice number with your payment |
| Invoice Date: | September 3 , 2021 |
| **TOTAL AMOUNT DUE ON October 3 , 2021** | **$10.95** |

This invoice is for the billing period August 1 - August 31 , 2021

Greetings from Amazon Web Services, we're writing to provide you with an electronic invoice for your use of AWS services. Additional information about your bill, individual service charge details, and your account history are available on the Account Activity Page.

| Summary | |
|---|---|
| AWS Service Charges | $10.95 |
| Charges | $10.95 |
| Credits | $0.00 |
| Tax | $0.00 |
| Total for this invoice | $10.95 |

| Detail | |
|---|---|
| Amazon Rekognition | $10.95 |
| Charges | $10.95 |
| Estimated US sales tax to be collected | $0.00 |

**Deleted:** ¶

aws Account number: [redacted] Bill to Address: St. Louis County Police Department ATTN: Sgt. D[redacted] 7900 FORSYTH BLVD SAINT LOUIS , MO , 63105-3809 , US Amazon Web Servic Invoice Summary Invoice Number: Invoice Date: TOTAL AMOUNT DUE ON Octol This invoice is for the billing period August 1 - August 31 , 2021 Summary AWS Service Charges Charges Credits Tax Total for this invoice Detail Amazon Rekognition Charges Estimated US sales tax to be collected

*<u>Defendants Shute, Goodwin, and Welle's Flagrant Violation of Photo Lineup Practices</u>*

113. M.F. had already told police at least **four times** previously that he did not know the identity of his assailants because he was knocked out and had a traumatic brain injury.

**Formatted:** Indent: Left: 0", First line: 0.5"

Despite this, and despite more than eight months elapsing since M.F.'s assault, Defendants Welle and Shute used a photo lineup and once again asked M.F.to identify Suspect 2 using the photo of Mr. Gatlin—incorrectly generated by facial recognition technology as a possible match— in the lineup.

114. National standards make clear that the passage of time is likely to decrease the accuracy of a photo lineup.

115. Defendants Shute and Welle selected Defendant Goodwin to interview M.F. and serve as a "blind administrator" of the photo lineup. A blind administrator is a common best police practice, as the blind administrator should not know which of the six photos is the suspect and thus will not indicate anything suggestive to the witness.

116. The three Defendant Officers visited M.F. at a rehabilitation unit where he continued to get treatment.

117. The photo lineup was videotaped on the Defendant Officers' body cameras, making evident their violation of policies and practices. *See Exhibit 1, Video of M.F. interrogation.*

118. In violation of "blind administrator" practices, Defendant Welle (who knew the identity of Mr. Gatlin) immediately began to talk to M.F.

119. Defendant Welle strongly hinted to M.F. that the correct suspect was in the lineup, in violation of practices and procedures.

120. National standards also require lineup administrators to notify witnesses that the suspect may or may not appear in the lineup, and that the witness should notify the administrators that s/he did not find a match; the Defendant Officers failed to do this.

121. When Defendant Goodwin began administering the test, he allowed M.F. to compare all six of the photographs at once, in violation of best practices. Best practices require sequential, not simultaneous, presentation of photos.

122. Although all of the photos were of Black men, the six photos presented to Defendant Goodwin varied in many ways: the age of the subjects, the skin complexion of the subjects, and even the date of the photographs. Based upon the dress and hairstyle of some subjects, several photos date back to at least the mid-1990's.

123. M.F. was still visibly shaken and told the officers that he had been diagnosed with a traumatic brain injury because of the assault. At the time of the photo line-up, he suffered from cognitive issues, speech issues, and decision-making problems due to his assault.

124. In addition to his previous four statements that he did not remember the identity of his assailants, M.F. made the following additional statements at the photo line-up that should have been clear warning signs that he was not a reliable witness:

a. "I was in and out of consciousness" during the assault.

b. "My memory is crap…"

c. "But after the hit, I don't remember…"

d. "After the hit, I remember nothing."

125. Most alarmingly, after several minutes of telling the officers that his memory was bad, **M.F. identified a photograph of a person ("Photo 6") who was not Mr. Gatlin.** M. F. told the three Defendant Officers, "I want to say it's him," pointing to Photo 6. Additionally, M.F. placed Mr. Gatlin's photo into a pile of other photos that he had eliminated.

126. Photo 6 portrays an African-American man who is considerably lighter-skinned than Mr. Gatlin. Photo 6 is also a photograph that is clearly dated—likely from the 1990's. Both

**Formatted:** Indent: Left: 0.5", First line: 0.5"

**Formatted:** Indent: Left: 0", First line: 0.5"

the variety of different appearances and the use of clearly dated photographs are violations of common best practices for photo line-ups. Additionally, because this person looks so unlike Suspect 2 in appearance, age, and dress, the ability of M.F. to determine who assaulted him should have further come into question.

127. After M.F. made the identification of Photo 6, Defendant Welle (who was not supposed to have any involvement with the line-up) did not accept M.F's answer. Instead, he walked over to M.F., stood over him, and began coaching him, saying the following:

> *Let's think about before the incident. You went up and you talked to them a little bit. Let's try to think about things that happened before the altercation with them. Maybe even before you initially went to talk to them. Take a minute and kind of ponder it…. Think about the characteristics of the guy,* ***his complexion,*** *did he have anything about his hair, or the clothing he was wearing?*

128. The reference to the "complexion" was a clear tip to M.F. to select the darker-skinned individual—here, that would be the photo of Mr. Gatlin.

129. As Defendant Welle stood over M.F. and coached him, M.F. took Mr. Gatlin's photo off of the pile of eliminated suspects. Welle then stepped back from M.F. but continued to coach him.

130. This interference and suggestive counseling by Defendant Welle violated every known best practice. It also violated SLMPD general orders on photo lineups, which state that the officer is to "Make certain not to provide any feedback to the victim(s)/ witness(es)." Despite these clear violations of department and national standards, Defendants Goodwin and Shute did not interfere or stop this coaching of the witness.

131. After Defendant Welle's suggestive comments to M.F., the witness changed his prior statement and identified Mr. Gatlin as his assailant.

132. After saying that he "thinks" the suspect was Mr. Gatlin, Defendant Shute further pushed M.F. into a bogus identification by suggesting, "It's the eyes, probably."

133. Soon after M.F. identified Mr. Gatlin as the suspect, the Defendant Officers said, "O.K!" with finality. Unlike the prior identification of Suspect 6, Defendant Officers did not allow M.F. further time to deliberate or provide further coaching—they simply asked him to sign the photograph of Mr. Gatlin and left.

*Defendant Officers Lie to Cover Up Their Bad Practices*

134. After the line-up, Defendant Shute falsified his police report by completely omitting Defendant Welle's involvement in the photo line-up. He wrote, "Police Officer Goodwin advised Detective Shute that [Victim] had made a positive identification of Mr. Defendant [*sic*] in the photo lineup as the man who assaulted him." This sentence leads to the natural inference that Defendant Shute was not present for the photo line-up, which would have been proper. However, it was false—both Shute and Welle remained present at the entire line-up, and Welle even interfered in the line-up, as described above. Moreover, video from the incident does not even show that Goodwin "advised" Shute of the positive identification, which was completely unnecessary since Shute was standing feet away from M.F. during the entire photo line-up.

**Formatted:** Indent: Left: 0", First line: 0.5"

135. Shute's use of the term "positive identification" was also false because it vouched a certainty in the identification that did not exist. There was nothing "positive" about the purported identification.

136. Defendant Shute's police report concerning the photo lineup also failed to include several other material facts, including:

a. M.F.'s misidentification of Defendants Shute and Welle's preferred suspect correctly on the first try.

b. Defendant Welle's interference and suggestive coaching of M.F.

c. The presence of Defendants Shute and Welle at the lineup.

137. Defendant Goodwin also drafted a one-page police report of the incident that completely omitted each of the material facts above.

138. Defendant Goodwin's report also falsely stated that M.F. was told that "physical attributes of the suspect may have been changed from the last contact he had with him to the time the photo was taken." Based upon a review of the entire meeting with the witness, M.F. was not given any such warning.

139. Both Defendants Shute and Welle knew or should have known that the practices of the photo line-up were in clear violation of St. Louis County policies for photo lineups.

140. The lineup violated the following additional policies of SLMPD:

a. SLMPD policies instruct officers to show images to the witnesses sequentially. The Defendant Officers violated this policy by placing all six images in front of M.F. at once.

b. SLMPD policies instruct officers to instruct witnesses that the procedure requires the investigator to ask the witness to state "in his/her own words, how certain he/she is of any identification." Obviously given his statements about his memory and his earlier identification of a totally different person, M.F. would not have stated that he had confidence in his selection.

**Formatted:** Indent: Left: 0.5", First line: 0.5", Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.44" + Indent at: 0.69"

**Formatted:** Indent: Left: 0", First line: 0.5"

**Formatted:** Indent: Left: 0.5", First line: 0.5", Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.44" + Indent at: 0.69"

c. The investigator is also to document "a statement of confidence in the witness's own words as to the certainty of his/her identification." Welle did not generate anything like this.

141. The coercive nature of the photo lineup was made more evident in the deposition of M.F. in Mr. Gatlin's criminal case, when M.F. made the following statements under oath:

a. [When asked what Suspect 2 looked like]: "African American gentleman. Face, I don't [remember]."

b. "Q: But at this time, do you remember any details about what he was wearing, his facial features? A: No."

c. [When asked what he told the police officers]: "But I did say again, 'I don't ·remember what the gentleman looks like.'"

d. When asked at the deposition if he was able to identify his potential assailant out of the six photographs used, M.F. was unable to identify anyone.

142. St. Louis County Police Department General Orders state that "If eyewitness identification is a major contributing factor, the officer shall, where practical, convey the witness to the Warrant Office **or arrange for the witness to go to the Warrant Office.**" This procedure is in place to ensure that attorneys in the Warrant Office verify that the eyewitness's statement is correct. Defendants Shute and Goodwin failed to follow this procedure, which could have prevented the wrong identification of Plaintiff.

*Shute's False Probable Cause Statement*

143. Defendants Shute and Welle proceeded through their reckless, arrest-at-all-costs investigation by issuing a "Wanted" for the arrest of Mr. Gatlin. Shute and Welle took no other steps to investigate whether Mr. Gatlin was a suspect in the case.

**Formatted:** Indent: Left: 0", First line: 0.5"

**Formatted:** Indent: Left: 0.5", First line: 0.5", Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.44" + Indent at: 0.69"

**Formatted:** Indent: Left: 0", First line: 0.5"

144. A "Wanted" is an unconstitutional order for arrest that completely avoids the constitution's requirement that arrests be accompanied by judicially-ordered findings of probable cause.

145. Based upon this Wanted, Defendants Shute and Welle proceeded to arrest Mr. Gatlin on August 14, 2021. There was no exigency justifying Mr. Gatlin's warrantless arrest, nor did the arrest fit within any other constitutional exception for warrantless arrests.

146. Mr. Gatlin was shocked upon his arrest, and understandably protested his innocence when he was interrogated by Shute and Welle.

147. Defendants Shute and Welle were undeterred by Mr. Gatlin's statements that he did not go to that area of North County, or that he did not generally ride the MetroLink.

148. On the evidence of an incorrect facial recognition and a suggestive photo lineup, Defendant Shute applied for a warrant for the arrest of Mr. Gatlin.

149. In his probable cause statement, sworn under penalty of law, Defendant Shute omitted the obvious flaws in the police investigation, and falsely wrote that "the defendant has been identified as one of the perpetrators of this offense."

150. This statement made many omissions of material facts known to Defendant Shute, including:

a. M.F. told police officers four separate occasions that he did not remember who assaulted him.

b. M.F. initially identified a different photograph at the line-up as the suspect.

c. After the identification of someone who was not Welle's preferred suspect, Welle coached M.F. and instructed him to consider things like "complexion."

**Formatted:** Indent: Left: 0.5", First line: 0.5"

d. The "identification" occurred more than eight months after the assault.

e. The image of Mr. Gatlin was generated from a process of facial recognition technology that was, according to the SMRT system policies, done incorrectly and without reliability, in part because the quality of the probe image was very low.

f. Even in otherwise more-reliable conditions, facial recognition technology cannot produce a positive identification, and has significantly higher rates of false matches when used on Black people, and both the suspect and Mr. Gatlin are Black.

g. Employees of homeless shelters had identified Suspect 2 as being homeless person they were familiar with; yet, Mr. Gatlin was not and had never been homeless.

151. These material omissions, if included in the probable cause statement, would have negated probable cause.

Formatted: Indent: Left: 0", First line: 0.5"

152. Based upon the material omissions and false representations, a judge signed off on Mr. Gatlin's warrant on August 15, 2021.

153. Using the same false and omitted information, Mr. Gatlin was indicted by a grand jury on September 29, 2021. If the jury had been presented with the information intentionally or knowingly omitted by Defendant Officers, they would not have found probable cause to indict Mr. Gatlin.

154. Throughout the almost four years of Mr. Gatlin's prosecution, Defendant Officers failed to come forward with the clear, exculpatory evidence of Mr. Gatlin's innocence.

155. St. Louis County General Orders place an affirmative duty on its officers to disclose any evidence that may negate the defendant's guilt, including:

a. Information that would directly negate the defendant's guilt concerning any count in an indictment.

b. Information that would cast doubt on the admissibility or weight of evidence that the prosecution plans to offer.

c. The failure of any proposed witness to make an identification of a defendant.

d. An inconsistent statement made orally or in writing by any proposed witness.

156. Each of the foregoing facts were present in the prosecution of Mr. Gatlin, and the Defendant Officers failed to affirmatively disclose this evidence.

157. Mr. Gatlin would go on to be jailed for more than a year over the next year and a half in the hellish St. Louis County Justice Center, a jail where people are routinely assaulted and die because of medical neglect.

158. Mr. Gatlin had never previously been incarcerated for more than a few days, much less a month.

159. He lost his job and any income for the entirety of his incarceration.

160. Mr. Gatlin endured regular 23-hour lockdowns in which he was not able to leave his cell for nearly the entire day. His cell was smaller than the size of a parking space.

161. His cell had no natural light.

162. Because of COVID restrictions, he routinely had to wear a mask for the entire day.

163. Pursuant to St. Louis County Jail polices, Mr. Gatlin was not allowed any books to read in jail.



Formatted: Indent: Left: 0.5", First line: 0.5"

Formatted: Indent: Left: 0", First line: 0.5"

164. Because of COVID, receiving visitors was extremely difficult, and Mr. Gatlin went months without seeing his sisters.

165. As is typical with detainees, St. Louis County provided little to no mental health services. Such services would of course have been essential given the shock Mr. Gatlin was facing.

166. For years, Mr. Gatlin believed that he would spend decades of his life in prison because of a crime he did not commit.

167. Mr. Gatlin, unmoored by his wrongful incarceration, acted out and spent several stints in solitary confinement.

168. It was not until the St. Louis County Prosecutor's Office finally produced the body camera footage of the photo line-up years after the incident that Mr. Gatlin's attorney was able to file a motion to suppress the photo line-up. Despite the damning evidence of dishonest practices found in the footage of the photo line-up, the St. Louis County Prosecutor's office still vehemently opposed the motion to suppress. The motion was granted in the spring of 2024, nearly three years after Mr. Gatlin's first arrest.

**Count 1: 42 U.S.C. § 1983**
**Unreasonable Seizure: Fourth and Fourteenth Amendments**
**Against Defendant Shute**

169. Plaintiff incorporates by reference all of the foregoing paragraphs.

Formatted: Indent: Left: 0", First line: 0.5"

170. Defendant Shute applied for the warrant for Mr. Gatlin's arrest.

171. The information included by Defendant Shute in the warrant application was false.

172. At the very least, the information in Defendant Shute's warrant application was made with reckless disregard for the truth, given the violation of procedures in the photo line-up and given M.F.'s repeated statements that he did not know who assaulted him.

173. In the alternative, material facts were omitted from the warrant application, including the foregoing facts:

a. M.F. initially identified the wrong person at the photo line-up;

**Formatted:** Indent: Left: 0.5", First line: 0.5"

b. M.F. only identified Mr. Gatlin after being coached to do so by one of the officers, who coached M.F. to give the answer that he wanted;

c. M.F. repeatedly told the officers at the photo line-up that his memory of the event was poor;

d. M.F. had told officers at least four times previously that he did not remember the identity of his assailants;

e. Defendant Shute had reason to believe that the main suspect was homeless, and Mr. Gatlin clearly had a home based on the information Shute had about him; and

f. Defendants Shute and Welle used the software that generated the photo of Mr. Gatlin in violation of the guidance of the program (including because the quality of the probe image was extremely low), making it more likely that the image they received from the program was incorrect.

**Deleted:** unlikely

g. Even in ideal conditions, facial recognition technology cannot produce a positive identification, and has significantly higher rates of false matches when used on Black people—and both the suspect and Mr. Gatlin are Black.

174. These omissions had the intent of making or were in reckless disregard of whether they could make the affidavit misleading.

Formatted: Indent: Left: 0", First line: 0.5"

175. The omitted information would have been clearly critical to the probable cause determination, and as such, Shute's actions were reckless.

176. Because Shute was in reckless disregard of the truth, he is not entitled to qualified immunity.

177. The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Mr. Gatlin such that punitive damages should be awarded to punish Defendant and deter him, as well as other similarly situated individuals, from engaging in similar conduct in the future.

178. If Plaintiff prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**Count 2: 42 U.S.C. § 1983**
**Due Process Violation, Reckless Investigation: Fourteenth Amendments**
**Against Defendants Shute, Welle, and Goodwin**

179. Plaintiff incorporates by reference all of the foregoing paragraphs.

Formatted: Indent: Left: 0", First line: 0.5"

180. Detective Shute falsified evidence in his police report when he stated that "Police Officer Goodwin advised Detective Shute that Mr. Feldman had made a positive identification of Mr. Gatlin in the photo lineup as the man who had assisted him." This statement raises the inference that Shute was not present during the photo line-up, which is false. This statement also falsely claims a "positive identification" when there was none.

181. Based upon review of the body camera, Det. Shute was present for the entirety of the photo lineup.

182. Defendant Officers made the following reckless errors in the course of conducting the photo line-up:

a. Defendant Welle stood coercively over M.F. after he identified the wrong person.

b. Defendant Welle suggestively coached M.F. after M.F. had initially identified the wrong person.

c. Defendants Shute and Goodwin were aware that the actions taken by Welle were in violation of best practices and St. Louis County's own policies regarding photo line-ups.

d. Defendant Shute failed to document Welle's coercive and suggestive coaching of the witness in his police report of the incident.

e. Defendant Goodwin failed to document Welle's coercive and suggestive coaching of the witness in his police report of the incident.

f. Defendant Shute and Goodwin failed to write in their police report that M.F. repeatedly told them that his memory of his assault was shaky.

g. Defendant Shute and Goodwin failed to write in their police report that M.F. initially identified a different suspect.

183. These failures were intentional or reckless, thereby shocking the conscience.

184. The Defendant Officers, acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Mr. Gatlin, intentionally caused Mr. Gatlin to be arrested, charged, and prosecuted for those crimes, thereby violating Gatlin's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

Formatted: Indent: Left: 0.5", First line: 0.5"

Formatted: Indent: Left: 0", First line: 0.5"

185. The Defendant Officers, acting individually and in concert, fabricated evidence, withheld and misrepresented exculpatory evidence, and failed to investigate in a manner that shocks the conscience, all of which resulted in an arrest and prosecution without probable cause.

186. The Individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Gatlin's clearly established constitutional rights. No reasonable officer in 2021 would have believed this conduct was lawful.

**Deleted:** 2020

187. The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Mr. Gatlin such that punitive damages should be awarded to punish Defendant and deter him, as well as other similarly situated individuals, from engaging in similar conduct in the future.

188. If Plaintiff prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**Count 3: 42 U.S.C. § 1983**
**Malicious Prosecution**
**Against Defendants Shute, Welle, and Goodwin**

**Deleted:** ¶
¶

189. Plaintiff incorporates by reference all of the foregoing paragraphs.

**Formatted:** Indent: Left: 0", First line: 0.5"

190. The Defendant Officers, acting separately and in concert, individually and in their official capacities, did willfully, unlawfully, maliciously and without probable cause or legal justification, cause Mr. Gatlin to be prosecuted, detained, and incarcerated for the assault of M.F.

191. Based upon M.F.'s repeated statements that he did not know who assaulted him, M.F.'s misidentification of his assailant, Defendant Welle's obvious coercive coaching of M.F., and no other evidence that would incriminate Mr. Gatlin, Defendant Officers knew, or should have known, that Mr. Gatlin was innocent. Nevertheless, without probable cause, the Defendant

Officers caused the commencement and continuation of proceedings against Mr. Gatlin. The Defendant Officers' conduct was actuated without any proper motive and with malice because the Defendant Officers knew or should have known that Mr. Gatlin was not the actual perpetrator of the crime.

192. The charges against Mr. Gatlin remained pending from August 13, 2021 until March 14, 2024, when the Circuit Clerk of St. Louis County filed the order of *nolle prosequi* entered by the St. Louis County Prosecuting Attorney.

193. As a direct and proximate result of the Defendant Officers' malicious prosecution of Mr. Gatlin, he faced prosecution and was incarcerated for crimes he did not commit, and suffered the physical and emotional damages as described above.

194. The acts described herein were intentional, wanton, malicious, and callously indifferent to the clearly established rights of Mr. Gatlin such that punitive damages should be awarded to punish Defendants and deter them, as well as other similarly situated individuals, from engaging in similar conduct in the future.

195. If Plaintiff prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**Count 4: 42 U.S.C. § 1985**
**Civil Conspiracy**
**Against Defendants Shute, Welle, and Goodwin**

196. Plaintiff incorporates by reference all of the foregoing paragraphs.

**Formatted:** Indent: Left: 0", First line: 0.5"

197. Defendants Shute, Welle, and Goodwin conspired with each other to deprive Mr. Gatlin of his constitutional rights, including his right not to be deprived of liberty without due process of law.

198. The officers acted together in furtherance of the conspiracy, including the following:

a. Being aware of M.F.'s identification of a different suspect and failing to document this bad identification in any police report or probable cause statement;

b. Being aware of Defendant Welle's interference and coercive coaching of M.F. and failing to document this interference in any police report or probable cause statement;

c. Being aware that the photo line-up conducted was in violation of their training their departments' policies, and failing to remedy the problems or document these failures;

d. Defendant Goodwin falsified statements in his police report;

e. Defendant Shute falsified statements and withheld material evidence in his probable cause statement.

199. The acts and omissions by the Defendant Officers described in the preceding paragraphs were the direct and proximate cause of Mr. Gatlin's injuries because the Defendant Officers knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, and incarceration of Mr. Gatlin.

200. In carrying out their conspiracy, the officers acted with racial animus.

201. The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Mr. Gatlin such that punitive damages should be awarded to punish Defendant and deter him, as well as other similarly situated individuals, from engaging in similar conduct in the future.

**Formatted:** Indent: Left: 0.5", First line: 0.5"

**Formatted:** Indent: Left: 0", First line: 0.5"

202. If Plaintiff prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**Count 5: 42 U.S.C. § 1983**
**Civil Conspiracy**
**Against Defendants Shute, Welle, and Goodwin**

203. Plaintiff incorporates by reference all of the foregoing paragraphs.

Formatted: Indent: Left: 0", First line: 0.5"

204. Defendants Shute, Welle, and Goodwin conspired with each other to deprive Mr. Gatlin of his constitutional rights, including his right not to be deprived of liberty without due process of law.

205. The officers acted together in furtherance of the conspiracy, including the following:

a. Being aware of M.F.'s identification of a different suspect and failing to document this bad identification in any police report or probable cause statement;

Formatted: Indent: Left: 0.5"

b. Being aware of Defendant Welle's interference and coercive coaching of M.F. and failing to document this interference in any police report or probable cause statement;

c. Being aware that the photo line-up conducted was in violation of their training their departments' policies, and failing to remedy the problems or document these failures;

d. Defendant Goodwin falsified statements in his police report;

e. Defendant Shute falsified statements and withheld material evidence in his probable cause statement.

206. The acts and omissions by the Defendant Officers described in the preceding paragraphs were the direct and proximate cause of Mr. Gatlin's injuries because the Defendant

Formatted: Indent: Left: 0", First line: 0.5"

Officers knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, and incarceration of Mr. Gatlin.

207. The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Mr. Gatlin such that punitive damages should be awarded to punish Defendant and deter him, as well as other similarly situated individuals, from engaging in similar conduct in the future.

208. If Plaintiff prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**Count 6: Missouri State Law**
**Strict Product Liability**
**Against Defendant AWS**

Deleted: ¶

209. Plaintiff incorporates by reference all of the foregoing paragraphs.

Formatted: Indent: Left: 0", First line: 0.5"

210. Defendant AWS designed, manufactured, sold, distributed, tested, marketed, instructed the facial recognition technology used as part of the SMRT program.

211. Defendant AWS knew or in the exercise of reasonable care should have known that the software would be used by its customers without conducting independent research into its efficacy or function.

212. Defendant AWS knew or should have known that facial recognition software disproportionately wrongly identifies African-American suspects, increasing the likelihood that an African-American would be wrongly identified, as Mr. Gatlin was.

213. Both at the time of the design and delivery into the stream of commerce, and at the time of Christopher Gatlin's arrest, the Rekognition program was in a defective condition and was unreasonably dangerous when put to its reasonably anticipated use in that:

a. Rekognition disproportionately misidentified faces of people of color;

Formatted: Indent: Left: 0.5", First line: 0.5"

b. Rekognition provided its product to law enforcement without any required training of proof that users understood the risks of misuse of FRT;

c. Rekognition produced images as potential matches for law enforcement even when AWS or Rekognition designers knew that the confidence threshold for the image was below the suggested level;

d. The program would attempt to generate match images even when the probe images was grainy and unclear, as in the case of the probe image used to generate a lead for Mr. Gatlin;

e. Rekognition failed to warn its users about the potential for misuse of the product, leading to false arrest and incarceration;

f. Such further defects as discovery and the evidence will reveal.

214. Despite this knowledge, Defendant AWS failed to warn its customers of the known problems with its product.

**Formatted:** Indent: Left: 0", First line: 0.5"

215. Defendant breached its duty of care by failing to update its training protocol and materials to inform its customers that the facial recognition technology had a disproportionate likelihood of falsely identifying African-Americans.

216. Defendant AWS failed to provide an adequate warning of the danger before selling the product.

217. The app was used by Defendant Welle in a manner reasonably anticipated, and the use of the Rekognition program was reasonably foreseeable by Defendant AWS.

218. Had Defendant AWS timely and reasonably provided adequate instructions and warnings regarding the defects in its product, Mr. Gatlin would have not likely been identified by the officers without any other incriminating information.

219. The defects as set forth above caused or contributed to cause Christopher Gatlin's arrest, incarceration, and prosecution.

220. Plaintiff requests compensatory damages and punitive damages in such a sum as will punish Defendant, and deter it from like conduct in the future, and for such other and further relief as the Court deems just and proper.

**Count 7: Missouri State Law**
**Negligent Design**
**Against Defendant AWS**

221. Plaintiff incorporates by reference all of the foregoing paragraphs.

**Formatted:** Indent: Left: 0", First line: 0.5"

222. At all times relevant, Defendant AWS owed a duty to Plaintiff and others to exercise reasonable care in the creation, design, development, testing, sale, deployment, delivery of Rekognition.

223. Defendant AWS designed, manufactured, sold, distributed, tested, and marketed, Rekognition.

224. Defendant AWS breached its duty owed to Plaintiff and others by developing and marketing Rekognition, in a defective and unreasonably dangerous condition, in that Rekognition was defective and unreasonably dangerous as set forth above.

225. Defendant AWS knew or in the exercise of reasonable care should have known that the software would be used by its customers without conducting independent research into its efficacy or function.

226. Additionally, Defendant AWS failed to exercise reasonable care in the creation, design, development, testing, sale, deployment of Rekognition, thereby breaching its duty owed to Mr. Gatlin and others in one or more of the following respects:

a. Rekognition disproportionately misidentified faces of people of color;

**Formatted:** Indent: Left: 0.5", First line: 0.5"

b. Rekognition negligently provided its product to law enforcement without any required training of proof that users understood the risks of misuse of FRT;

c. Rekognition produced images as potential matches for law enforcement even when AWS or Rekognition designers knew that the confidence threshold for the image was below the suggested level;

d. The program would negligently and carelessly attempt to generate match images even when the probe images was grainy and unclear, as in the case of the probe image used to generate a lead for Mr. Gatlin;

e. Rekognition negligently and carelessly failed to warn its users about the potential for misuse of the product, leading to false arrest and incarceration;

f. Such further defects as discovery and the evidence will reveal.

**Deleted:** <#>Rekognition negligently and carelessly failed to

**Formatted:** Indent: Left: 0", First line: 0.5"

227. Defendant AWS knew or should have known that facial recognition software disproportionately wrongly identifies African-American suspects, increasing the likelihood that an African-American would be wrongly identified, as Mr. Gatlin was.

228. Despite this knowledge, Defendant AWS failed to warn its customers of the issues with its product.

229. Defendant breached its duty of care by failing to update its training protocol and materials to inform its customers that the facial recognition technology had a disproportionate likelihood of falsely identifying African-Americans.

230. Had Defendant AWS timely and reasonably provided adequate instructions and warnings about the above problems, African-Americans, Mr. Gatlin would have not likely been identified by the officers without any other incriminating information.

231. As a proximate result of Defendant AWS's negligence, Mr. Gatlin suffered and has been damaged.

232. Plaintiff requests compensatory damages and punitive damages in such a sum as will punish Defendant, and deter it from like conduct in the future, and for such other and further relief as the Court deems just and proper.

**Count 8: Missouri State Law**
**Negligent Failure to Warn**
**Against Defendant AWS**

233. Plaintiff incorporates by reference all of the foregoing paragraphs.

**Formatted:** Indent: Left: 0", First line: 0.5"

234. At all times relevant, Defendant AWS owed a duty to Plaintiff and others to exercise reasonable care in the creation, design, development, testing, sale, deployment, delivery of Rekognition.

235. In addition, Defendant AWS owed a duty to Plaintiff and others to exercise ordinary care to warn Plaintiff and others of the risks posed by defects in Rekognition.

236. Defendant AWS breached its duty owed to Plaintiff and others by developing and marketing the Rekognition in a defective and unreasonably dangerous condition, in that Rekognition was defective and unreasonably dangerous as set forth above.

237. AWS failed to exercise reasonable care in the creation, design, development, testing, sale, deployment of Rekognition in that it knew of the defects listed above and failed to warn the users about said defects. AWS negligently and carelessly concealed known dangers existent in the AWS application, and failed to adequately disclose those known dangers to its users.

238. As a direct and proximate result of the careless and negligence of Defendant AWS, Christpher Gatlin was wrongly incarcerated and prosecuted.

239. Had Defendant AWS timely and reasonably provided adequate instructions and warnings regarding the possibility of false identification of African-Americans and the possibility of misidentification generally, Mr. Gatlin would have not likely been identified by the officers without any other incriminating information.

240. As a proximate result of Defendant AWS's negligence, Mr. Gatlin suffered and has been damaged.

241. Plaintiff requests compensatory damages and punitive damages in such a sum as will punish Defendant, and deter it from like conduct in the future, and for such other and further relief as the Court deems just and proper.

**Count 9: Missouri State Law**
**Negligent Training**
**Against Defendant AWS**

Deleted: ¶
¶

242. Plaintiff incorporates by reference all of the foregoing paragraphs.

Formatted: Indent: Left: 0", First line: 0.5"

243. At all times relevant, Defendant AWS owed a duty to Plaintiff and others to exercise reasonable care to train users to use their program with reasonable safety.

244. Defendant AWS failed to exercise reasonable care in providing training to its users, in that AWS failed to adequately train its users, including but not limited to failing to train users to understand the risks of mis-identification of individuals as described above and of the issues with cross-racial identification.

245. As a direct and proximate result of the careless and negligence of Defendant AWS, Christpher Gatlin was wrongly incarcerated and prosecuted.

246. Plaintiff requests compensatory damages and punitive damages in such a sum as will punish Defendant, and deter it from like conduct in the future, and for such other and further relief as the Court deems just and proper.

**Count 10: Missouri State Law**
**Negligence**
**Against Defendant AWS**

247. Plaintiff incorporates by reference all of the foregoing paragraphs.

Formatted: Indent: Left: 0", First line: 0.5"

248. At all times relevant, Defendant AWS owed a duty to Plaintiff and others to exercise reasonable so as to not endanger or harm Plaintiff or others in the operation of its business.

249. Defendant AWS had actual knowledge that Rekognition was not being used properly by law enforcement and that African Americans were at risk of being misidentified by its Rekognition program.

250. Despite this knowledge, Defendant failed to exercise reasonable care to prevent individuals, including Plaintiff, from being wrongfully targeted in investigations.

251. Defendant AWS failed to exercise reasonable care in providing training to its users, in that AWS failed to adequately train its users, including but not limited to failing to train users to understand the risks of mis-identification of individuals as described abvoe and of the issues with cross-racial identification.

252. As a direct and proximate result of the careless and negligence of Defendant AWS, Christpher Gatlin was wrongly incarcerated and prosecuted.

253. Plaintiff requests compensatory damages and punitive damages in such a sum as will punish Defendant, and deter it from like conduct in the future, and for such other and further relief as the Court deems just and proper.

**Count 11: 42 U.S.C. § 1983**
**Municipal Liability—Custom and Failure to Train**
**Against Defendants St. Louis County and St. Louis City**

Deleted: ¶
¶

254. Plaintiff incorporates by reference all of the foregoing paragraphs.

Formatted: Indent: Left: 0", First line: 0.5"

255. Mr. Gatlin was injured and had his Fourth Amendment right to be free of unreasonable seizures violated because SLCPD and SLMPD established inadequate policies, failed to train officers, and exhibited a custom of acquiescence regarding deficient facial recognition practices.

*Custom or Usage Against St. Louis County*

256. The St. Louis County Police Department has employed a custom or usage of allowing its officers to use the SMRT facial recognition technology program.

Formatted: Indent: Left: 0", First line: 0.5"

257. This practice of allowing officers unfettered use of facial recognition technology without supervision, guidance, or training was so widespread as to have the force of law.

258. The standard practice among law enforcement agencies is for facial recognition searches to be run only by trained specialists, not by investigating officers.

259. Moreover, pursuant to custom and practice, officers were enabled to use this highly invasive and risky tool without any training or support.

260. Given the publicly-known flaws of FRT, St. Louis County was deliberately indifferent to the risk of false identification and false incarceration.

261. The policies for use of facial recognition technology by St. Louis County officers left a host of factors unregulated. For instance, although the SMRT procedures had several possible ways of double-checking an officers' work (such as the use of a trained expert and the ability to make an investigating officer describe the exact similarities in the photos), neither SLMPD nor SLCPD required such safeguards.

Deleted: SCPD

262. This custom of providing unfettered access to FRT without any training or supervision was deliberately indifferent. Moreover, given the well-known and well-documented

failures of FRT, both SLMPD and SLCPD were or should have been on notice that such false positives were likely to occur.

Deleted: SCPD

263. Mr. Gatlin was injured by the widespread custom and usage of SLMPD and SLCPD.

*Failure to Train—FRT*

264. The flaws and weaknesses of facial recognition technology were both knowable and known at the time that Welle and Shute used the SMRT program, yet neither St. Louis County nor St. Louis City Police Department took any steps to train its officers to avoid the pitfalls of facial recognition.

Formatted: Indent: Left: 0", First line: 0.5"

265. Many publications had already existed as of August 2021 that would have put SLMPD and SLCPD on notice that there was a serious risk of misidentification of individuals that would lead to wrongful arrests.

266. Moreover, SMRT training documents even made clear that there was a serious risk of misidentification for a variety of reasons, and yet neither SLMPD nor SLCPD required its officers to undergo training before using this tool.

Deleted: SCPD

267. Despite these clear warnings, neither department trained its officers.

268. The decision not to train its officers on the use of FRT was a deliberate and conscious choice by both SLMPD and SLCPD from among a host of different options.

269. In failing to train its officers on the use of FRT and allowing those same officers to use this tool, both SLMPD and SLCPD were deliberately indifferent to the likelihood that a person would be wrongly identified, arrested, charged, and incarcerated.

270. SLMPD's and SLCPD's failures were the cause of Mr. Gatlin's arrest, prosecution, and incarceration.

*Failure to Train—Cross-Racial Identification*

271. Defendants Shute and Welle picked the image of Mr. Gatlin from a host of different images generated by the SMRT System, somehow concluding that Mr. Gatlin was the perpetrator, despite obvious differences in physical appearances between Mr. Gatlin and the much older Suspect 2.

Formatted: Indent: Left: 0", First line: 0.5"

272. The flaws and weaknesses of cross-racial identification technology were both knowable and known at the time that Welle and Shute used the SMRT program, yet neither St. Louis County nor St. Louis City Police Department took any steps to train its officers to avoid the pitfalls of facial recognition. *See United States v. Telfaire*, 469 F.2d 552, 559 (D.C. Cir. 1972) (Bazelon, C. J., concurring) ("The available data, while not exhaustive, unanimously supports the widely held commonsense view that members of one race have greater difficulty in accurately identifying members of a different race."). *See also* ABA Update on August 2008 Meeting (recommending the adoption of specific jury instructions when cross-racial identification exists.) http://ndaa.org/wp-content/uploads/ABA_Pros_july_sept_08.pdf.

273. Despite these clear issues, neither department trained its officers to address their own potential biases in cross-racial identification, as occurred when Defendants Welle and Shute (both white) became certain that they had correctly matched the image from the SMRT system.

274. Moreover, despite these clear issues, neither department trained its officers to be wary of cross-racial misidentification of witnesses like M.F.

275. The decision not to train its officers on cross-racial identification was a deliberate and conscious choice by both SLMPD and SLCPD from among a host of different options.

276. In failing to train its officers on cross-racial identification and allowing those same officers to use this tool, both SLMPD and SLCPD were deliberately indifferent to the likelihood that a person would be wrongly identified, arrested, charged, and incarcerated.

277. SLMPD's and SLCPD's failures were the cause of Mr. Gatlin's arrest, prosecution, and incarceration.

*Failure to Train—Photographic Line-ups against St. Louis County*

278. Defendants Shute, Welle, and Goodwin were all present at a photographic line-up with victim M.F. in which the three officers flagrantly violated a host of policies and best practices regarding the vitally important issue of photographic lineups.

**Formatted:** Indent: Left: 0", First line: 0.5"

279. The best practices regarding photo lineups were both knowable and known at the time that Welle, Shute, and Goodwin conducted their line-up, yet all three officers allowed the many such violations of these practices.

280. For instance, by 2021, the Commission on Accreditation for Law Enforcement Agencies ("CALEA") had promulgated for years a set of standards regarding the correct administration of photo lineups.

281. The lineup Defendant Officers conducted of M.F. violated at least six of the CALEA standards and practices, yet none of the three officers said or documented anything indicating that the lineup had occurred incorrectly.

282. In addition, upon information and belief SLCPD has no general orders or other training or written guidance directing police officers regarding the best practices for conducting photo lineups.

283. The decision not to train, or to under-train its officers on correct use of photographic lineups was a deliberate and conscious choice by SLCPD from among a host of different options.

284. In failing to train its officers on the correct methods of photographic lineups SLCPD were deliberately indifferent to the likelihood that a person would be wrongly identified, arrested, charged, and incarcerated.

285. SLCPD's failures were the cause of Mr. Gatlin's arrest, prosecution, and incarceration.

286. In all of the foregoing failures to train—in use of FRT, in use of cross-racial identification, and in use of photographic lineups—SLMPD and SLCPD failed to provide training in situations where the need for trainings on those give topics was obvious.

Deleted: SCPD

287. Moreover, it is apparent that the failure to provide training in such cases is likely to lead to the violation of constitutional rights, and therefore both entities were deliberately indifferent to the need for more and further training.

288. Given the common deployment of FRT, the common identification of suspects across race, and the need for detectives to use photo lineups, it is highly likely that the failures described above would lead to the constitutional violations of the sort suffered by Mr. Gatlin.

289. If Plaintiff prevails, he is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**Count 12: Missouri State Law**
**False Arrest**
**Against Defendants Shute and Welle**

290. Plaintiff incorporates by reference all of the foregoing paragraphs.

Formatted: Indent: Left: 0", First line: 0.5"

291. Defendants did intentionally, willfully, unlawfully, maliciously, and without probable cause or legal justification cause Mr. Gatlin to be arrested, incarcerated, and prosecuted for the assault of M.F.

292. Defendant Officers knew that the only evidence to connect Mr. Gatlin to the assault was the identification by M.F.—an identification that was not merely wrong but also coerced.

293. Nevertheless, Defendant Officers suppressed that information by failing to document this evidence.

294. Defendants engaged in this course of conduct without concern for or consideration of Mr. Gatlin's perceived guilt or innocence.

295. As a direct and approximate result of Mr. Gatlin's false arrest, he was wrongfully detained and incarcerated for a crime he did not commit and suffered the physical and emotional damages as described above.

**Count 13: Missouri State Law**
**Malicious Prosecution**
**Against Defendants Shute, Welle, and Goodwin**

296. Plaintiff incorporates by reference all of the foregoing paragraphs.

**Formatted:** Indent: Left: 0", First line: 0.5"

297. The Defendant Officers, acting separately and in concert, individually and in their official capacities, did willfully, unlawfully, maliciously and without probable cause or legal justification, cause Mr. Gatlin to be prosecuted, detained, and incarcerated for the assault of M.F.

298. Based upon M.F.'s repeated statements that he did not know who assaulted him, M.F.'s misidentification of his assailant, Defendant Welle's obvious coercive coaching of M.F., and no other evidence that would incriminate Mr. Gatlin, Defendant Officers knew, or should have known, that Mr. Gatlin was innocent. Nevertheless, without probable cause, the Defendant

Officers caused the commencement and continuation of proceedings against Mr. Gatlin. The Defendant Officers' conduct was actuated without any proper motive and with malice because the Defendant Officers knew or should have known that Mr. Gatlin was not the actual perpetrator of the crime.

299. The charges against Mr. Gatlin remained pending from August 13, 2021 until March 14, 2024, when the Circuit Clerk of St. Louis County filed the order of *nolle prosequi* entered by the St. Louis County Prosecuting Attorney.

300. As a direct and proximate result of the Defendant Officers' malicious prosecution of Mr. Gatlin, he faced prosecution and was incarcerated for crimes he did not commit and suffered the physical and emotional damages as described above.

**Count 14: Missouri State Law**
**Civil Conspiracy**
**Against Defendants Shute, Welle, and Goodwin**

301. Plaintiff incorporates by reference all of the foregoing paragraphs.

302. Defendant Officers worked together to commit the wrongful acts described herein, including the state law torts of false arrest and malicious prosecution

303. The officers acted together in furtherance of the conspiracy, including the following:

a. Being aware of M.F.'s identification of a different suspect and failing to document this bad identification in any police report or probable cause statement;

b. Being aware of Defendant Welle's interference and coercive coaching of M.F. and failing to document this interference in any police report or probable cause statement;

Deleted:

Formatted: Indent: Left: 0", First line: 0.5"

Formatted: Indent: Left: 0.5", First line: 0.5"

c. Being aware that the photo line-up conducted was in violation of their training the their departments' policies, and failing to remedy the problems or document these failures;

d. Defendant Goodwin falsified statements in his police report;

e. Defendant Shute falsified statements and withheld material evidence in his probable cause statement.

304. The acts and omissions by the Defendant Officers described in the preceding paragraphs were the direct and proximate cause of Mr. Gatlin's injuries because the Individual Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, and incarceration of Mr. Gatlin.

305. The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Mr. Gatlin such that punitive damages should be awarded to punish Defendants and deter them, as well as other similarly situated individuals, from engaging in similar conduct in the future.

**WHEREFORE**, Plaintiff Christopher Gatlin prays as follows:

A. That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B. That the Court award punitive damages to Plaintiff, and against AWS and all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988 for all federal claims; and

Formatted: Indent: Left: 0", First line: 0.5"

Deleted: ¶

E. For all other relief to which Plaintiff may be entitled.

Date: October 20, 2026 Respectfully Submitted,

Deleted: August 13

Deleted: 19

**KHAZAELI WYRSCH LLC**
*/s/ John M. Waldron*
John M. Waldron, #70401MO
James R. Wyrsch, #53735MO
Javad M. Khazaeli, #53197MO
Leah M. Fessler, #76824MO
911 Washington Avenue, Suite 211
St. Louis, Missouri 63101
(314) 288-0777
(314) 400-7701 (Facsimile)
jack.waldron@kwlawstl.com
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com
leah.fessler@kwlawstl.com

Formatted: Default Paragraph Font, Font: Calibri

Formatted: Default Paragraph Font, Font: Calibri

Formatted: Default Paragraph Font, Font: Calibri

Formatted: Font: Calibri

Formatted: Space After: 8 pt